EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DELIO ROSARIO GONZÁLEZ, acusado y apelante. EL MISMO, demandante y apelado, *v.* EL MISMO, acusado y apelante.

Número 16390.

*Sometido:* 5 de mayo de 1958. *Resuelto:* 19 de mayo de 1958.

*Esteban Susoni Lens,* abogado del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo, Arturo Estrella, Secretario Auxiliar de Justicia, Alfredo Archilla Guenard* y *William Fred Santiago, Fiscal* y *Fiscal Auxiliar del Tribunal Supremo,* respectivamente, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del Tribunal.

Delio Rosario González fué acusado ante el Tribunal Superior, Sala de Arecibo, de haber infringido los arts. 6 y 7 de la Ley de Armas de Puerto Rico—Núm. 17 de 19 de enero de 1951, Sesión Extraordinaria, pág. 427, 25

L.P.R.A. sec. 411.(¹)   Ambas acusaciones eran por delitos menos graves consistentes éstos en haber poseído y portado, sin licencia para ello, un arma de fuego que no estaba cargada.   Vistos ambos casos conjuntamente ante tribunal de derecho, se le declaró culpable en ambos y se le sentenció a sufrir ocho meses de cárcel en el caso de portación y seis meses de cárcel en el de posesión, esta última sentencia a cumplirse concurrentemente con la primera.   De las sentencias así dictadas apeló ante este Tribunal señalando como único error: *"El tribunal sentenciador incurrió en manifiesto error, prejuicio y parcialidad en la apreciación de la prueba"*. (Bastardillas nuestras.)

██ En el alegato del apelante la única argumentación acerca del error apuntado, transcrita literalmente, es la siguiente:

"Por tratarse de una transcripción de evidencia sumamente corta argumentamos en conjunto la declaración de los únicos dos testigos, que declararon, que son: Raúl Medina Molina y Osbaldo Galeano González.

"Podrá el Hon. Tribunal percatarse de la abierta contradicción en la declaración de uno y otro testigo.

"El testigo Raúl Medina Molina, declaró que el acusado sacó un revólver y le apuntó con el mismo, y que con un palo él le quitó el revólver y al caer al suelo lo cogió Osbaldo Galeano. En la descripción del arma solamente dice que era de cañón corto, al mismo tiempo mostrando que era como de seis pulgadas y niquelado.

---

(¹) El art. 6 de la Ley de Armas de Puerto Rico—25 L.P.R.A. sec. 416—dispone:

"Toda persona que tenga o posea cualquier pistola, revólver u otra arma de fuego sin tener una licencia para ello expedida como más adelante se dispone, será culpable de delito menos grave, y si ha sido convicta con anterioridad de cualquier infracción a este capítulo o de cualquiera de los delitos especificados en la sec. 427 de este título, o usare el arma en la comisión de uno de dichos delitos, será culpable de delito grave."

El art. 7 de la misma ley—25 L.P.R.A. sec. 417—dispone:

"Toda persona que porte, conduzca o transporte cualquier pistola, revólver u otra arma de fuego sin tener una licencia para ello expedida como más adelante se dispone, será culpable de delito menos grave, y si ha sido convicta con anterioridad de cualquier infracción a este capítulo o de cualquiera de los delitos especificados en la sec. 427 de este título, o usare el arma en la comisión de uno de dichos delitos, será culpable de delito grave."

"Veamos pues, que en la declaración del testigo Raúl Medina Molina, la agresión fué originada por el acusado.

"En la declaración del otro testigo Osbaldo Galeano González, pág. 10, línea 8, dicho testigo declara que Raúl Medina Molina, le dió con un palo al acusado Delio Rosario González, y éste refiriéndose al acusado, sacó un revólver, el cual no pudo identificarlo muy bien, porque se le cayó a él.

"En la página 12, línea 3, dicho testigo declara que el revólver era de cabo corto, renegrido, como mohoso. Dicha declaración está en abierta contradicción a la descripción dada por el primer testigo, quien dice que era niquelado.

"Dicho testigo a su vez insiste en que era un arma de fuego pero también insiste en que no pudo identificarlo y solamente dice que era un arma de fuego porque daba vuelta la masa.

"Este Hon. Tribunal, en repetidas ocasiones ha expresado que cuando el arma no ha sido ocupada, la prueba debe ser clara y convincente.

"Cabe ahora preguntar ¿Ha sido la prueba clara? Los únicos dos testigos presentados por el ministerio público, difieren fundamentalmente en la descripción del arma.

"Por lo anteriormente expuesto, entendemos que el honorable tribunal inferior, cometió prejuicio y parcialidad en la apreciación de la prueba, y SOLICITAMOS la revocación de la sentencia."

Con frecuencia hemos dicho que en procesos por portar armas, cuando ésta no se presenta por no haber sido ocupada, la prueba del fiscal debe ser clara y convincente. *Pueblo* v. *Oquendo*, 79 D.P.R. 542, 546 (1956); *Pueblo* v. *Pacheco*, 78 D.P.R. 24, 29 (1955); *Pueblo* v. *Garcés*, 78 D.P.R. 102, 107 (1955); *Pueblo* v. *Rupizá*, 72 D.P.R. 744, 746 (1951); *Pueblo* v. *Guzmán*, 52 D.P.R. 458, 459 (1938); *Pueblo* v. *Cartagena*, 37 D.P.R. 281, 284 (1927). No hay duda de que en este caso lo fué. Veamos en sus partes pertinentes las declaraciones de los dos testigos de cargo Raúl Medina Molina y Osbaldo Galeano González, quienes manifestaron:

*Raúl Medina Molina:*

"  .        .        .        .        ,        .        .        .

"Hon. Fiscal: Señalando al acusado.

"P. ¿Allá para el 5 de agosto de este año vió usted a Delio Rosario y en dónde? —Yo lo ví. Yo estaba en la barbería recortando a un hermanito mío y salí y lo ví en la plazuela de Miraflores.

"P. ¿Qué es eso? —Un sitio, una plazuelita donde hay muchos cafetines y esas cosas.

"P. ¿El sitio donde lo vió es un sitio póblico donde va la gente, plazuela o calle? —En la calle allí.

"P. ¿Qué pasó? —Entonces yo dejé a mi hermanito allí cerca de la tienda de Tiburcio Pérez y fuí a la tienda de Delfín a buscar unos lindberghs para él y cuando regresé encontré al nene llorando y le pregunté por qué lloraba.

"P. ¿Después que pasó? —Entonces le dije a Delio Rosario que por qué le había dado al nene. Entonces me dijo él: 'Y qué, le dí al nene y te mato a tí porque tengo un revólver aquí y no tengo ninguno inscrito a nombre de nadie'. Al ver que sacó el revólver y me apuntó, yo tenía un canto de palo que cogí y con él me defendí.

"P. ¿José Román estaba allí? —Sí, señor.

"P. ¿Y qué otro más? —Herminio Astol y el nene.

"P. ¿Hizo algo con alguna otra persona allí él? —Sí, señor. Entonces, mientras yo estoy parado preguntándole eso, dió la vuelta por detrás y empujó a José Román encima de mí.

"P. ¿Encima? —Sí, señor.

"P. ¿Dónde cayó José Román? —En la carretera.

"P. ¿Lo empujó contra usted? —Sí, señor.

"P. ¿Entonces sacó el revólver? —Sí, señor.

"P. ¿Qué hizo con el revólver? —Se metía a despejarnos la gente porque quería entrarme a tiros a mí.

"P. ¿Qué hizo usted? —Cuando me apuntó me le apeché y nos emburujamos a ver si le podía quitar el revólver, al notarle el revólver, y yo tenía un palo en la mano y le quité el revólver y al caer lo cogió Osbaldo Galeano que está aquí también.

"P. ¿Cómo era el revólver? —El revólver era de cañón corto, niquelado.

"P. ¿Cómo es? —Así.

"Hon. Fiscal: El testigo muestra seis pulgadas.

"P. ¿Cómo era el cañón? —Corto.

"P. ¿Qué color? —Niquelado."

A preguntas del abogado Sr. Reyes Delgado, declaró:

"        .        .        .        .        .        .        .

"P. ¿Usted no había visto el revólver antes de sacarlo del bolsillo? —No, señor. Él lo sacó del bolsillo y lo aluzó porque hay una lámpara del mismo poste.

"P. ¿Eso fué de noche? —Fué como a las siete.

"P. ¿Él lo aluzó así? —Sí, señor.

"P. ¿Dónde está el revólver? —El que lo sabe es Osbaldo Galeano, que cuando le dí el palo que nos emburujamos para quitárselo él lo cogió.

"        .        .        .        .        .        .        .

"P. ¿Qué fué primero, el empujón sobre de Ramón Vélez o sacar el revólver? —Sacar el revólver.

"P. —¿Con el revólver en la mano empujó al otro? —Sí, señor.

"P. ¿Luego él sacó el revólver y le apuntó? —Sí, señor.

"P. ¿Enseguida? —Lo sacó así y al sacarlo dijo: 'yo tengo este revólver y no lo tengo inscrito a nombre de nadie y te voy a matar' y dió la vuelta y me tiró a José Román encima.

"P. ¿Ese fué su movimiento? —Sí, señor. Entonces, cuando el empujón, que le dije que por qué hacía eso, entonces mandó a despejar la gente para entrarme a tiros.

"P. ¿No le hizo nada? —No, señor.

"P. ¿Galeano es familia suya? —No, señor.

"P. ¿Y de él? —Primo hermano de él."

*Osbaldo Galeano González:* A preguntas del fiscal declaró:

"        .        .        .        .        .        .        .

"P. ¿Se refiere al acusado? —Sí, señor.

"P. ¿Usted es González? —Sí, señor.

"P. ¿Y él también? —Sí, señor. El segundo apellido.

"P. ¿Son familia? —Sí, señor.

"P. ¿Qué son? —Él es primo mío.

"P. ¿Primos hermanos? —Primos hermanos.

"P. ¿Las relaciones de usted y él cuáles son? —.  .  .  .  .

"P. ¿No es enemigo de él? —Yo nunca. Nos hemos llevado muy bien siempre.

"P. ¿Esa amistad ha sido durante muchos años o de poco tiempo? —No nos vemos diariamente.

"P. ¿Se ven a menudo? —A menudo.

"P. ¿La amistad y familiaridad existe? —Sí, señor.(²)

"    .    .    .    .    .    .    .

"P. ¿Explique si vió a Delio Rosario ese día alrededor de las siete de la noche y qué pasó, si pasó algo, en qué interviniera su primo? —Yo me encontraba en la plazuela Miraflores ese domingo 5 de agosto hablando con un amigo. Entonces el señor Rosario venía en bicicleta bajando. Yo estoy parado así y se paró la bicicleta y estaba Raúl Medina parado así y tenía a la espalda un palo escondido. Entonces él brincó y le dió a Delio Rosario con el palo."

A preguntas del Hon. Juez, declaró:

"P. ¿Quién? —Raúl Medina.
"P. ¿A quién? —A Rosario.
"P. ¿Al acusado? —Sí, señor. Entonces, al darle, él sacó un revólver, un revolvito pequeño. No lo identifiqué muy bien porque se le cayó a él y lo levanté.

"P. ¿Qué levantó? —El revólver que se le había caído a él cuando el otro le dió. Se le cayó cerca, a esa distancia lo localicé, y con la misma rapidez lo tiré sin identificarlo muy bien. Entonces el señor Delio me decía: 'dame el revólver, dame el revólver', y le dije, 'lo boté', infuriado encima de mí, le dije, 'lo boté'. Entonces vinieron unas personas alrededor y lo metieron a la tienda de Miguel González y allí quedó él. Cerraron las puertas de la tienda y lo encerraron en la tienda."

A preguntas del Hon. Fiscal, declaró:

"P. ¿Dónde le dió el palo Raúl Medina primero? —En el brazo derecho.
"P. ¿Dónde? —En la muñeca.
"P. ¿Por qué fué que le dió ahí y no le tiró por la cabeza? —No sé porqué fué.
"P. ¿Qué tenía en la mano antes de recibir el palo Delio Rosario? —Antes de recibir el palo no le ví nada.
"P. ¿Se lo vió despúes? —Después cuando le tiré a él ahí sacó el arma que le dió y se fué al suelo.
"P. ¿De dónde sacó el revólver su primo? —Yo lo identifiqué que lo sacó del bolsillo.
"    .    .    .    .    .    .    .    .

---

(²) Nótese que el testigo indicó que era primo hermano del acusado y que siempre se ha llevado bien con él.

"P. ¿Fué después a buscar el revólver? —No, señor.

"P. ¿Quién lo fué a buscar? —Hasta ahí no se. En el revulú me fuí a dormir a casa.

"P. ¿El revólver cómo era? —Le ví como el cabo corto, renegrido, como mohoso.

"P. ¿Tenía algún otro color? —No, señor. No tengo la seguridad de decirle claramente porque como con la misma rapidez lo tiré.

"P. ¿Lo cogió del suelo e inmediatamente lo tiró? —Sí, señor.

"P. ¿Por qué lo tiró? —Lo tiré evitando un *trouble*.

".       .       .       .       .       .       .       ."

A preguntas del abogado Sr. Susoni, declaró:

"P. ¿Usted dice que no pudo percatarse de cómo era el arma? —No, señor.

"P. ¿No sabe si era un arma de fuego? —Sé que era arma de fuego porque ví que volteaba la maza muy rápido y era corto, demasiado de corto el cabo.

"P. ¿Usted no puede describir cómo era? —No puedo describirla bien porque no pude identificarla tan rápido. Sé que era un arma de fuego.

"P. ¿Por qué lo sabe si no sabe cómo era? —Porque yo he visto los revólveres de fulminantes y sé en la forma que es.

"P. ¿Pudo ser de otra cosa o imitación, que no fuera arma de fuego? —Sé que . . .

"P. ¿Usted no puede describir cómo era el arma? —No puedo describir bien, claramente, cómo era el arma."

A preguntas del Hon. Juez, declaró:

"P. ¿Por qué si no sabe cómo era el arma, por qué la botó para evitar un *trouble*? —Lo boté.

"P. Conteste. —La boté porque tuve la imaginación y estaba seguro de que era un arma.

"P. ¿Por qué dice que estaba seguro que era un arma? —Yo, a la verdad, era un revólver.

"P. ¿Por qué dice que era un revólver? —Por la vaga identificación que tuve.

"P. ¿Cómo fué la identificación de usted para estar seguro? —Al mirarla.

"P. ¿Qué miró usted? —El revólver cuando lo cogí.

"P. ¿Que miró del revólver? — . . .

"P. ¿Que miró del revólver que le hizo creer que era un arma de fuego? —Yo lo boté.

"P. ¿Por qué lo botó? — . . .

"P. ¿Por qué dice que era un revólver? —Porque estaba en la seguridad. Porque estaba en la seguridad de que era un revólver lo que veía.

"P. ¿Qué le hizo creer que era un revólver y que lo tenía que botar? —Ví la maza.

"P. ¿Qué vió en la maza? ¿Cómo era la maza? —Redonda.

"P. ¿Que volteaba? —Sí, señor.

"P. ¿Contenía algo? —No ví que contenía nada.

"P. ¿Cuando lo cogió qué notó usted, era liviano o pesado? —Pesado."

Luego de las declaraciones de estos dos testigos, el fiscal sometió el caso indicando:

"El resto de la prueba es de carácter acumulativo. La declaración de José Román Ríos, Herminio Astol y Adalberto Medina, un menor de edad, son de carácter acumulativo y los ponemos a disposición del compañero de la defensa."

La defensa no presentó prueba alguna y se limitó a decir lo siguiente:

"Nosotros vamos a someter el caso con esa prueba. Entendemos que es una prueba floja. A nuestro juicio, no tiene quien le haya descrito el arma en la forma que ha resuelto nuestro Tribunal Supremo, de que cuando no se ocupa el arma debe describirse en tal forma que no deje la menor duda en el ánimo del juzgador."

Como hemos visto, el recurso se funda exclusivamente en una alegada contradicción en que incurrieron los dos testigos de cargo al describir el arma. Alega el apelante que uno de ellos dijo que "el revólver era de cabo corto, renegrido, como mohoso" y que el otro testificó "que era niquelado". Aun suponiendo que dicha contradicción constituyera motivo para revocar, la verdad es que no hay tal contradicción. Lo que uno de los testigos declaró era que el *cañón* del revólver era corto y niquelado y el otro indicó que el *cabo* era corto

y renegrido, como mohoso. Por otro lado, ambos testigos están contestes en que realmente era un revólver lo que sacó el acusado. El testigo Medina Molina indicó que el acusado sacó un revólver del bolsillo y lo apuntó, que era de cañón corto, niquelado, y que ". . . lo aluzó porque hay una lámpara del mismo poste . . ." El testigo Galeano González, que fué el que tomó el arma y la botó, declaró que el acusado había sacado un revólver del bolsillo, ". . . un revolvito pequeño . . .", que le vió "como el cabo corto, renegrido, como mohoso . . ." y que sabía que era un arma de fuego porque ". . . ví que volteaba la maza muy rápido y era corto, demasiado corto el cabo." Declaró además dicho testigo que cuando cogió el revólver notó que era "pesado".

Aunque, como señala el apelante, el testigo Galeano González declaró en el sentido de que Medina Molina le dió con el palo al acusado *antes* de que este último sacara el revólver y, por otro lado, Medina Molina testificó que "al ver que (el acusado) sacó el revólver y me apuntó, yo tenía un canto de palo que cogí y con él me defendí . . .", este hecho nada tiene que ver, naturalmente, con la responsabilidad que impone la ley por el hecho de poseer y portar un arma sin licencia.

Por tanto, no hubo en realidad conflicto en la evidencia y ésta demostró en forma clara y convincente la culpabilidad del acusado. Si lo hubiera habido, la prueba que hemos reseñado demuestra fuera de toda duda que no hay base para alterar la apreciación que de la misma hizo el juez sentenciador. *Pueblo* v. *Aquino*, 79 D.P.R. 18 (1956); *Pueblo* v. *Garcés*, 78 D.P.R. 102 (1955); *Pueblo* v. *Piñeiro*, 77 D.P.R. 531 (1954); *Pueblo* v. *Comas*, 75 D.P.R. 413 (1953); *Pueblo* v. *Millán*, 71 D.P.R. 440 (1950).

En verdad es difícil imaginarse una apelación más frívola que ésta. Sin embargo, hemos creído conveniente escribir una larga opinión por lo siguiente: (1) innumerables apelaciones frívolas llegan constantemente ante nos tanto en

casos civiles como en casos criminales; y (2) los abogados y la opinión pública deben conocer la forma en que estos casos frívolos sobrecargan el calendario y entorpecen la labor de este Tribunal. La estadística demuestra que en el año judicial 1955–56 se presentaron 645 casos ante este Tribunal. Durante el año siguiente (1956–57) se presentaron 727 casos nuevos. Ahora bien, en este último año judicial resolvimos 824 casos. De ese total más del 34 por ciento eran *apelaciones frívolas* en casos civiles y criminales. Por eso decidimos 284 apelaciones en ese año *"por sentencia"*, es decir, sin emitir una opinión explicando los fundamentos del fallo. Sin embargo, antes de dictar sentencia *en los méritos*, los jueces de este Tribunal tienen en cada caso que estudiar detenidamente un expediente que, entre otras cosas, contiene lo siguiente: *primero*, la transcripción *completa* de los autos ante el tribunal de instancia (esto es, las alegaciones, las mociones y resoluciones interlocutorias, la sentencia, etc.) ; *segundo*, la transcripción de *toda* la prueba oral y documental presentada en el juicio; y *tercero*, los alegatos de ambas partes. A menudo se solicita y se celebra una vista para informar oralmente el caso. Y siempre es preciso considerar cuál debe ser la decisión en una conferencia de todos los jueces que integran el Tribunal.

Por tanto, la resolución "por sentencia" evita tener que escribir una opinión sobre cosas obvias, pero no resuelve el problema que crean las apelaciones frívolas. Lo grave es que, además de las apelaciones civiles y criminales, tenemos que resolver también un número considerable de recursos de certiorari, de recursos de revisión contra organismos administrativos, de hábeas corpus, de quejas contra jueces, abogados y notarios, de mociones de desestimación y de reconsideración, de procedimientos de desaforo de abogados y destitución de jueces, de asuntos relacionados con el Registro de Poderes y con los informes de los Inspectores de Protocolos, de recursos gubernativos, etcétera. Véanse, por ejemplo, Cuarto Informe Anual del Director Administrativo de

los Tribunales (1955–1956) y Quinto Informe Anual del Director Administrativo de los Tribunales (1956–57). Lo indicado no cubre las funciones del Tribunal relativas a los exámenes de reválida, a las Reglas de Ética para jueces y abogados, a las Reglas de Evidencia, de Procedimiento Civil, de Procedimiento Criminal, de Administración de los Tribunales, de la Conferencia Judicial, etcétera. Esa labor, en su aspecto cuantitativo y en su exigencia de calidad, apenas trasciende al público. En verdad pocos abogados la conocen.(3) En los tomos de decisiones sólo se publican nuestras opiniones. Y aun las estadísticas no revelan todos los asuntos que el Tribunal considera y resuelve porque muchos son de naturaleza interna o administrativa.

Huelga decir que el proceso judicial exige tiempo suficiente para estudiar y reflexionar. Además, para impartir justicia y elaborar doctrinas jurídicas adecuadas, un tribunal colegiado tiene que disponer del sosiego y del reposo intelectual necesarios, sin los cuales toda discusión entre mentes debidamente instruídas es imposible.

*Las sentencias apeladas serán confirmadas.*

El Juez Presidente Sr. Negrón Fernández no intervino.

---

(3) Esto se debe en parte a que la resolución declarando "no ha lugar" a un recurso de certiorari o de revisión no se notifica al abogado de la parte contraria. Sólo se le notifica en caso de expedirse el auto. Una situación parecida existe en cuanto a las mociones de reconsideración.