*104 Voto disidente emitido por la
Jueza Asociada Señora Fiol Matta.
La decisión de cambiar la composición del Tribunal Supremo no es propiamente una decisión adjudicativa. Al to-marla, el Tribunal no sopesa los argumentos de unos liti-gantes ni examina la prueba que cada uno ha presentado para determinar si los tribunales de instancia y apelativo aplicaron correctamente el Derecho. La decisión de cam-biar el número de jueces y juezas de este Tribunal afecta a la institución que salvaguarda y representa nuestra democracia. Porque lo que define y permite nuestra demo-cracia, que es lo mismo que decir lo que protege nuestras libertades y garantías constitucionales, es la seguridad y tranquilidad de que una institución que actúa con indepen-dencia del juego político tendrá la última palabra sobre las actuaciones de las ramas Ejecutiva y Legislativa, y que lo hará desapasionadamente, siguiendo procesos determina-dos y aplicando normas de Derecho.
Por eso, lo que se decide hoy no es otra decisión judicial. Es una decisión institucional y, como tal, debió haberse tomado por la institución del Tribunal Supremo y no por un grupo de Jueces que, por ser cuatro, constituyen la ma-yoría mínima requerida para decidir un caso cualquiera en este Tribunal. (1)
*105 I
Es cierto que la Constitución no expresa en tantas pa-labras que la decisión de variar el número de Jueces Aso-ciados debe tomarse por consenso. Pero sí requiere que sea a petición “del propio Tribunal Supremo”, no “de una ma-yoría del Tribunal”.(2) Esa disposición, como tantas otras disposiciones constitucionales, ha sido objeto de interpre-tación por el Tribunal; interpretación que, como las demás, debe considerarse vinculante para entender y precisar su contenido.
¿Y dónde está esa interpretación?, dirán mis compañe-ros y mi compañera de la Mayoría, ¿dónde están las pala-bras que requieren un consenso para tomar esta decisión? A eso respondo: no toda palabra está escrita.(3) Si para in- *106 terpretar algo tan cotidiano como un contrato nuestro or-denamiento nos remite no sólo a su texto, sino a “los actos coetáneos y posteriores” que rodean su concreción(4) cuánto más podrán decirnos las actuaciones, los actos, de este Tribunal en las pocas ocasiones en que ha expresado la posibilidad de cambiar su composición.
Como veremos, esos actos de quienes nos precedieron no sólo indican, sino que gritan a voz partida que la decisión de variar la composición de este Tribunal es constitucional solamente cuando se toma por consenso. Sólo así es que *107 puede decirse que la petición provino, como requiere la Constitución, “del propio Tribunal Supremo”.(5)
I — i h-H
Son aleccionadores la seriedad y el sosiego demostrados por el Tribunal y la Rama Legislativa en las otras ocasio-nes en que abordaron la posibilidad de cambiar el número de Jueces de este Tribunal. Hasta los miembros de la Con-vención Constituyente optaron por dar tiempo al estudio a fondo de las bondades de un número mayor al de cinco jueces, a pesar de que los propios Jueces del cuerpo pidie-ron el aumento en las vistas previas a la Convención. (6) El resultado de esta decisión fue que, en 1952, se aumentó el *108 Tribunal a siete Jueces, por legislación, a petición del Tribunal, según se había discutido por varios años y se había avalado por consenso.(7)
Tras la aprobación de la Constitución del Estado Libre Asociado y de la Ley Orgánica de la Judicatura de 1952, el asunto de la composición numérica del Tribunal Supremo se consideró nuevamente en 1960. A diferencia del proceso atropellado que hoy enfrentamos, el aumento en los inte-grantes de este Tribunal hace más de 50 años fue producto del consenso. El anuncio del Tribunal solicitando una am-pliación de su composición no fue un acto unilateral de una mayoría de un voto, sino el esfuerzo concertado de toda nuestra estructura de gobierno, y tuvo como elementos centrales la participación directa del Pueblo y el acuerdo general dentro y entre las ramas.
Dicen que quien no aprende de la historia está conde-nado a repetir sus fracasos. Un ejemplo claro de esto es la intención expresada en la Resolución que hoy aprueba la Mayoría de que el Tribunal se divida en salas. El aumento propuesto en 1960 tenía ese mismo objetivo, y para eso se consultó al Pueblo y éste aprobó una enmienda constitucional. (8) El proceso que aumentó el número de Jueces de este Tribunal a nueve, por única vez en nuestra historia constitucional, fue producto del consenso al interior del Tribunal y de la Asamblea Legislativa, así como del acuerdo de la Rama Ejecutiva y del favor contundente del
*109 Pueblo.(9) Al igual que la aprobación de nuestra Constitu-ción, fue un proceso integrado y producto de un consenso social generalizado. No fue el resultado del cálculo superficial de una mayoría incidental.
A pesar de ese consenso, la realidad es que el meca-nismo de operar en salas no funcionó. Si bien tuvo un im-pacto en nuestro calendario de casos, el Derecho puertorri-queño sufrió de falta de cohesión, integración, coherencia y rumbo.(10) A sólo cuatro años de iniciarse el experimento, el Tribunal decidió reevaluarlo. Ese proceso de reevaluación no fue atropellado ni improvisado. No fue discutido indivi-dualmente entre algunos Jueces excluyendo a los demás. En vez de aprobar una Resolución, aunque fuera por con-senso, solicitándole a la Asamblea Legislativa que bajara el número de Jueces, nombramos un Comité para que eva-luara el funcionamiento del propio Tribunal Supremo. En su Informe, el Comité concluyó que la operación en salas fue un error.(11)
El 19 de febrero de 1975, tras más de una década de evaluación y tras un proceso de estudio y ponderación, este Tribunal, nuevamente por unanimidad, solicitó a la *110 Asamblea Legislativa que restaurara su composición nu-mérica anterior. Lo que manifestamos en aquella Resolu-ción revela que la solicitud de 1975 fue producto de la ex-periencia y el consenso, y no de la especulación o el atropello. Ante los eventos actuales, lo que dijimos en aquel entonces resulta también aleccionador:
[E]s nuestro criterio que un Tribunal Supremo compuesto de un Juez Presidente y seis Jueces Asociados puede con toda eficiencia atender las necesidades de justicia del país; signifi-caría economías de importancia; y podría demostrar, conforme a la experiencia de otras jurisdicciones, que el remedio a la congestión de casos y a la demora en su trámite no consiste necesariamente en el aumento continuo de jueces. (Enfasis suplido.)(12)
En 1984, los Jueces consideraron nuevamente la posibi-lidad de modificar la composición del Tribunal. Era aún un diálogo interno cuando el Tribunal, sin obligación de ha-cerlo, decidió informárselo a la comunidad. Mediante Reso-lución, informamos que había una división en el seno del Tribunal sobre el número óptimo deseable de miembros y que por ello se había acordado no recomendar a la Asam-blea Legislativa un cambio en nuestra composición.(13) Es decir, ante la falta de consenso y unanimidad entre los Jue-ces, el Tribunal entendió que lo que procedía era no hacer una solicitud dividida de cambio. En aquel entonces, el tribunal colegiado salió fortalecido. Lamentablemente, hoy no hemos actuado con esa responsabilidad y ese respeto institucional.
En 1994, hubo un nuevo intento de aumentar el número de integrantes de este Tribunal.(14) Esa vez, no fue el pro- *111 ducto de un análisis ponderado al interior del cuerpo, sino de una propuesta de campaña de un partido político.(15) La razón para el aumento se articuló esta vez, no como una respuesta a necesidades funcionales del Tribunal, sino como la búsqueda de un “balance ideológico” entre sus miembros.(16) Lo que sucedió fue descrito por el profesor José Julián Álvarez González como la versión tropical del “Court Packing Plan”.(17)
El partido que hizo la propuesta de añadir Jueces al Tribunal Supremo ganó las elecciones en 1992, lo cual po-día interpretarse como un mandato en esa dirección. Sin embargo, cuando se le preguntó directamente al Pueblo su opinión sobre el asunto, su respuesta fue contundente-mente en contra, demostrando así que la “marea” electoral no siempre otorga un cheque en blanco. La falta de con-senso en el proceso de 1994 se notó, no únicamente en que el Tribunal no solicitó el cambio propuesto, sino también en el rechazo contundente del Pueblo a la idea de aumen-tar el número de Jueces de su más alto Tribunal. En el *112 Referéndum de 1994, el electorado no sólo reafirmó que las modificaciones en nuestra composición deben surgir “del propio Tribunal Supremo”, según dispone la Constitución, sino que rechazó por unos 120,000 votos la propuesta del partido de gobierno de una enmienda constitucional para aumentar a nueve los Jueces del Tribunal Supremo.(18)
Hoy la Mayoría ha optado por eliminar al Pueblo de la ecuación.(19) Hoy 4 votos valen más que los de 712,026 puertorriqueños y puertorriqueñas que en 1994 rechaza-ron su propuesta.
III
Pero hay más. Nuestro Tribunal es claramente un foro colegiado, lo cual significa, en su sentido básico, que es un cuerpo cuyos miembros deliberan en conjunto antes de to-mar decisiones.
Hace cinco décadas, señalamos que “la existencia de un tribunal colegiado de última instancia sólo se justifica por-que emite sentencias que son colectivas; esto equivale a decir que se obtienen mediante un proceso de deliberación y de discusión entre varios jueces y que reflejan principios jurídicos cuya sabiduría es superior a la que cada juez ais-ladamente podría alcanzar mediante su esfuerzo individual. Para ese fin se creó y existe el Tribunal Supremo de Puerto Rico”.(20)
*113 En Pueblo v. Rosario, expusimos que “para impartir jus-ticia y elaborar doctrinas jurídicas adecuadas, un tribunal colegiado tiene que disponer del sosiego y del reposo inte-lectual necesarios, sin los cuales toda discusión entre men-tes debidamente instruidas es imposible”.(21) La misma re-flexión sosegada es necesaria para evaluar propuestas sobre la organización de nuestro cuerpo, como la que se ha adoptado hoy. Las medidas que impactan el funciona-miento del Tribunal requieren una atención especial y un análisis cabal, porque el Tribunal es una institución y los actores dentro de las instituciones no operan sólo en el momento en que pertenecen a éstas, sino que se proyectan también en el futuro.
En las decisiones cotidianas, no vacilamos en afirmar que la mayoría manda. Pero el genio de nuestro diseño constitucional y de los profundos valores de dignidad, res-peto, comunidad y hermandad que le acompañan parten de un sentimiento mayor: cuando se trata del quehacer mismo de un pueblo, del futuro institucional de un país, de decisiones trascendentales que afectarán la vida de millo-nes de nuestros compatriotas, del rumbo colectivo que he-mos de emprender, de la Constitución que nos une en una identidad común, la mera contabilización de quién tiene más votos en un momento particular se torna en infinita-mente insuficiente y en síntoma innegable de una falta de madurez democrática e institucional.(22) Nuestra Constitu- *114 ción “representa, en ese sentido, una llamada al consenso”.(23)
Nuestro ordenamiento constitucional reconoce la impor-tancia del consenso para las decisiones trascendentales que tendrán un impacto duradero en nuestra vida colectiva. La Constitución exige consenso para un sinnú-mero de decisiones.(24) Es decir, no obstante el mandato electoral, para aquellos asuntos que son de trascendencia e impacto duradero, la Constitución exige cooperación y con-senso: no los confía a las mayorías coyunturales que a ve-ces caen en la irresistible tentación de abusar de su poder pasajero. Incluso en el campo de la contienda electoral, el consenso es un principio que, colectivamente, hemos reco-nocido como esencial.(25)
El consenso institucional para las decisiones de vital im-portancia en el orden constitucional parte de una premisa que no se apoya en la colaboración coaccionada. Por el con-trario, se fundamenta en un entendimiento que ha estado presente desde nuestra génesis constitucional y que no se basa únicamente en una orden de nuestra Ley Suprema, sino en un reconocimiento de que las decisiones de trascen-dencia histórica nos afectan a todos y todas por igual.
*115 IV
Modificar sin justificación la composición de un Tribunal Supremo como el nuestro, cuyos miembros son nom-brados, no electos, es un curso de acción que invita a la inestabilidad de las instituciones. Por ejemplo, cuando se estudia la historia del Tribunal Supremo de Estados Uni-dos, más allá del frustrado “Court Packing Plan” de 1937, es notable que los momentos de mayor debilidad, falta de credibilidad y politización de ese cuerpo coincidieron, no casualmente, con las mayores modificaciones en el número de sus integrantes. Durante el periodo de la Reconstruc-ción tras la Guerra Civil, la lucha de poder político invadió al Tribunal Supremo de Estados Unidos, lo que se mani-festó, según Friedman, en la constante manipulación del tamaño del Tribunal durante esa época.(26) Es decir, lo que Friedman llamó una “corte política” se asocia con la visión de que el Tribunal Supremo debe moverse en sintonía con la marea política del momento y que su composición numé-rica es fácilmente manipulable.
La Resolución a la cual nos oponemos provee, como ra-zón para el aumento de siete a nueve Jueces, una supuesta congestión de casos sin atender.(27) Reclama el remedio sin demostrar el mal, pues los datos en los que se apoya son fallidos. Pero aunque no lo fueran, el remedio propuesto está totalmente desacreditado en los círculos jurídicos.
El argumento de la congestión del calendario del Tribunal debe tomarse con mucha cautela por su potencial uso como canto de sirena. Un vistazo a cómo las jurisdicciones de Estados Unidos han atendido este asunto demuestra que no hay tal cosa como una causa y efecto entre conges-tión y tamaño del Tribunal. Los estudios y discusiones en *116 Estados Unidos en cuanto a la carga de los tribunales es-tatales no apoyan la conclusión a la que, sin fundamento empírico, llega la Mayoría.(28) Por eso, entre otras razones, es que no ha habido una cultura de cambio en la composi-ción de los tribunales supremos de los estados de Estados Unidos.
La incongruencia entre el alegado problema de conges-tión y el remedio ofrecido es aun más preocupante cuando se toma en consideración la velocidad con la que se pre-tende despachar un asunto de tanta envergadura. En esta ocasión, no estamos ante un asunto de tal urgencia en tér-minos de tiempo que nos exija sacrificar la deliberación y ponderación que una decisión de esta envergadura requiere o que justifique una mera contabilización de votos, sin más.
V
Hoy los perdedores son claros: este Tribunal como insti-tución y la confianza depositada en nosotros como entes imparciales.(29) Al acordarse la Resolución que hoy se aprueba por algunos de los Jueces y Juezas de este Tribu *117 nal, sin participación de los demás, se destruye el concepto de un Tribunal colegiado. No se cumple con este principio al otorgar, como si fuera una concesión o dádiva, cuatro escasos días para estudiar, analizar, investigar, ponderar y expresar nuestro parecer sobre la decisión monumental que se pretende tomar. Sin dudas, dista mucho del llamado que hiciera el Senador Reyes Delgado cuando hizo énfasis en la importancia de que este Tribunal tome decisiones producto de la reflexión y la deliberación.(30) Es aun más contradictorio cuando se plantea que una de las razones para incrementar el número de integrantes de este Tribunal es para que tengamos más tiempo para el análisis de los casos.
El Tribunal Supremo no es la suma de, hasta ahora, siete Jueces y Juezas. Es un solo Tribunal. Es una “corte”, en el sentido de que, más que un determinado grupo de Jueces y Juezas, es “un propósito, una visión que informa el descargo de la encomienda pública que recibe el Tribunal”.(31) A medida que un grupo de Jueces y Juezas a su interior actúe a espaldas de los otros, destruimos la con-fianza del Pueblo en su más alto foro judicial como institu-ción ajena al vaivén partidista y al juego de poder. Pobre de nuestro País cuando el debilitamiento de nuestras institu-ciones y la falta de confianza de nuestro Pueblo en ellas son producto de las acciones de aquellas personas encarga-das de su tutela y protección.
VI
El lunes en la tarde llegó a mi oficina un sobre sellado y rotulado como “confidencial”. Este contenía copia de una Resolución y un corto memorando de trámite que infor-maba que, de obtener la mayoría, se procedería a certificar *118 la Resolución el viernes siguiente, es decir, hoy.(32) No ha-bían transcurrido dos horas cuando ya estaban también en mi oficina tres sobres confidenciales, cada uno con el timbre de los jueces que, con el cuarto, componen la Mayoría. En cada sobre había un escueto memorando del juez o jueza informando su conformidad con lo propuesto en la Resolución.
No estoy diciendo que mis compañeros jueces y compa-ñera jueza no deliberaron antes de tomar esa decisión. Es-toy segura que lo pensaron mucho, pues no es una decisión sencilla o rutinaria. Pero esa deliberación tuvo lugar es-trictamente entre ellos. Lo que no hubo fue la deliberación del Tribunal Supremo.
Como miembros de un tribunal colegiado, se supone que podamos discutir los asuntos planteados. Es más, como mí-nimo, se supone que esos asuntos se planteen a todas y todos los que componemos el Tribunal antes de que se tome la decisión final. Eso no fue lo que sucedió aquí. Aquí no hubo diálogo. Aquí no hubo intento de colegian Aquí lo que hubo fue el anuncio de un fait accompli, un aviso de lo que ya se había decidido, junto a la concesión de cuatro escasos días para que los demás pudiéramos expresarnos.
No hay decisión, y mucho menos petición, del Tribunal Supremo cuando tres de sus Jueces se enteran de ello prác-ticamente a la misma vez que el resto del País.
Por todo lo antes expuesto, con mucho pesar, disiento.

 “Las decisiones de este Tribunal en pleno —-una de las cuales es esta Reso-lución— se adoptan por la mayoría de los Jueces que intervienen.” Resolución ma-yoritaria, In re Solicitud Aumentar Núm. Jueces TS, 180 D.RR. 54, 56-57 (2010). Escudándose en la disposición de nuestro Reglamento que así provee, ese grupo de cuatro Jueces ignoró que esta Curia está compuesta por siete personas. Amparados en una regla que se refiere a las decisiones sobre casos civiles, criminales y de con-ducta profesional y judicial, y no a las resoluciones sobre el funcionamiento del Tribunal, mis compañeros descartaron el valor de la deliberación en una institución diseñada con ese objetivo; desecharon la idea de que la articulación de nuestro ejer-cicio judicial merece una discusión seria entre todos los Jueces y todas las Juezas que integramos el Tribunal Supremo del País. Véase Regla 4(a) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A.

 Véase Art. V, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 412. De acuerdo con José Trías Monge, el propósito de que fuera el Tribunal el que solicitara el aumento de Jueces fue, precisamente, garantizar constitucionalmente la indepen-dencia judicial, lo cual fue visto con buenos ojos por el Congreso de Estados Unidos, por entender que así se protegía al Tribunal de los intentos de controlarlo mediante la llamada estrategia del “court packing”. J. Trías Monge, El sistema judicial de Puerto Rico, Río Piedras, E.D.U.P.R., 1978, pág. 120. Sin embargo, hubo quienes temieron que sirviera para todo lo contrario. Entre éstos, el delegado Leopoldo Figueroa Carreras, en la Convención Constituyente, manifestó preocupación por que la disposición permitiera manipular políticamente a los jueces. Sobre esto, expresó: “[E]stoy mirando para el futuro, estoy visualizando a lo lejos, porque vosotros sabéis de hoy, yo sé que vosotros vivís muy confiados de la mayoría, cuatrocientos mil votos os tienen embriagados, esa borrachera del triunfo que vosotros sentís no os deja razonar, no os deja reflexionar, no os deja ser ecuánimes, no os deja que la luz de la razón, las más de las veces, sea la que ilumine vuestras actuaciones, pero yo os recuerdo, amigos, ¿qué garantía podría haber con un ejecutivo poco escrupuloso que empieza a maniobrar con los señores del Supremo y jueces que pudieran ...? ... Suponed una situación como ésta, con un ejecutivo poco escrupuloso, que metiera su mano pecadora en el Supremo y que los jueces del Supremo resultaran jueces flojos y que viniere entonces la petición a la [Asamblea] Legislativa. ¿Qué estaríais ha-ciendo vosotros? ¿Qué habríais hecho? Pues habríais abierto la puerta a una inmo-ralidad política y habrías echado una sombra sobre la Constitución de Puerto Rico”. (Corchetes en el original y suplidos.) 1 Diario de Sesiones de la Convención Consti-tuyente 538 (2003).

 En diversas áreas del Derecho se ha reconocido la existencia de normas que no están, necesariamente, plasmadas en un texto. En la Convención Constituyente, al presentarse el Informe de la Carta de Derechos sobre la presunción de inocencia y su importancia en nuestro ordenamiento, se hizo referencia a “nuestra constitución no escrita”. 4 Diario de Sesiones de la Convención Constituyente 2569 (2003). En el contexto específico del aumento de Jueces en el Tribunal Supremo, el profesor Luis Rafael Rivera Rivera plantea que “sería muy delicado enviar una propuesta a la *106 Legislatura sin un consenso en el ámbito del Tribunal, como ha sido la regla no escrita”. (Énfasis suplido.) L.R. Rivera Rivera, Los bemoles del gigantismo judicial (2010) (en proceso de publicación, en poder de la autora). Véase además la referencia al “precepto de ley no escrita y tradicional” hecha por el Juez Asociado Negrón García en Convoc. Sesión Especial Conf. Judicial, 120 D.P.R. 838, 844 (1988). Por una norma no escrita fue que el Tribunal Supremo de Estados Unidos decidió el famoso caso Papachristou v. City of Jacksonville, 405 U.S. 156, 164 (1972), cuando el Juez Douglas habló de los “unwritten amenities” que forman parte de la tradición consti-tucional de ese país. En el contexto contributivo también se recurre a la fuente no escrita. “[N]on-written operative rules ... serve an hermeneutic function because they provide ex ante possible interpretations.” Carlo Garbarino, An Evolutionary Approach to Corporative Taxation: Methods and Agenda for Research, 57 Am. J. Com. L. 677, 696 (2009). Incluso, algunos tratadistas europeos han optado, al escri-bir sobre las fuentes de derecho privado, por publicar dos textos: uno sobre fuentes escritas y otro sobre fuentes no escritas. R. Sacco, “Le fonti non scritte e l’interpretazione” en G. Alpa y otros, 2 Le fonti del diritto italiano, Torino, UTET, 1999, según citado en G. Alpa, The European Civil Code: “E Pluribus Unum”, 14 Tul. Eur. & Civ. L.F. 1, 8-12 (1999). Este asunto también ha sido fuente de análisis por el derecho comparado, particularmente en cuanto a la multiplicidad de fuentes jurídi-cas que deben emplearse al momento de interpretar: “[Multiplicity] means that a non-written element exists between the legal source and its interpretation, or it proves that a written rule does not have the force that would be necessary to replace an old customary rule.” Lama Abu-Odeh, The Politics of (Mis)recognition: Islamic Law Pedagogy in American Academia, 52 Am. J. Comp. L. 789, 813-814 esc. 52 (2004).
De igual forma, existe la costumbre, que es “una fuente de derecho enmarcada dentro del principio de equidad y la cual ha sido ampliamente utilizada”. Fajardo v. D.I.P., 126 D.P.R. 619, 639 (1990), opinión disidente del Juez Asociado Hernández Denton, citando a M. Álbaladejo, Comentarios al Código Civil y compilaciones fera-les, Jaén, Ed. Rev. Der. Privado, T. 1, págs. 48-51. Hemos empleado la costumbre como “fuente de interpretación” en el contexto penal. Pueblo v. Díaz, 160 D.P.R. 1, 28 (2003). También lo hemos hecho en el derecho sucesorio, en donde hace falta “exa-minar, entre otros asuntos, la cultura, las costumbres”. Moreda v. Rosselli, 150 D.P.R. 473, 482 (2000).

 Art. 1234 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3472.

 Según explicó el delegado Ernesto Ramos Antonini, en su carácter de presi-dente de la Comisión de la Rama Judicial de la Convención Constituyente, el propó-sito fundamental de este precepto era evitar “la intervención más flagrante contra la independencia del poder judicial” mediante el aumento o disminución de la cantidad de jueces en el momento en que “cualquier legislatura o ejecutivo, juntos, tuvieran el deseo o el propósito de, en alguna forma, lograr, mediante una variación del Tribunal Supremo, decisiones que no fueran las necesariamente mandadas por el criterio jurídico”. 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 455 (2003). “El propósito de eficiencia en la organización y funcionamiento de la Rama Judicial está íntimamente vinculado y depende fundamentalmente, en lo que toca a la Rama Judicial repito, de la independencia del poder judicial”, indicó Ramos Antonini. Id., pág. 452. Como sabemos, las sociedades democráticas contemporáneas valoran altamente la independencia de la rama judicial frente a otras instituciones que detentan el poder. D.E. Herrendorf, El poder de los jueces: cómo piensan los jueces que piensan, 3ra ed., Buenos Aires, Abeledo-Perrot, 1998, pág. 37.

 De acuerdo con la discusión en la Convención Constituyente, la razón para no aumentar la composición del Tribunal a siete Jueces en la misma Constitución fue permitir que la Asamblea Legislativa evaluara con detenimiento si realmente el re-medio para el problema de exceso de trabajo de los cinco Jueces que componían el Supremo en ese momento era aumentar su número. Entendían que, para tomar tal decisión, no bastaba un mero testimonio, aunque fuera de Jueces del Tribunal Supremo. Véase 1 Diario de Sesiones de la Convención Constituyente 521 (2003). Tampoco era suficiente que la medida y sus fundamentos se hubieran estado consi-derando desde 1938, cuando se solicitó al Senado de Estados Unidos que aumentara el número de Jueces debido al alza en el volumen de trabajo y la diversidad de asuntos nuevos presentados. Si empleamos el principio hermenéutico de analizar los actos coetáneos y posteriores para adscribirle intención al actor de éstos, como hemos descrito anteriormente, la conducta de la Convención Constituyente revela que la petición de aumentar la cantidad de integrantes del Tribunal Supremo requiere una expresión institucional y no la mera anuencia de un número de Jueces.

 La petición se había repetido en diversas ocasiones, incluso ante la Comisión de la Rama Judicial de la Convención Constituyente. Véase Resolución del Tribunal Supremo de Puerto Rico solicitando el aumento de su composición, aprobada el 26 de julio de 1952 y recogida en la ley que avaló el pedido: Ley Núm. 2 de 4 de agosto de 1952.

 La Asamblea Legislativa aprobó, por unanimidad, la Ley Núm. 121 de 13 de julio de 1960, ordenando la celebración de un referéndum a esos fines, que se llevó a cabo el 8 de noviembre de 1960. La enmienda fue aprobada por el electorado. El 27 de enero de 1961, por voz del Juez Presidente Negrón Fernández, el Tribunal solicitó a la Asamblea Legislativa, por unanimidad, que aumentara el número de Jueces Asociados a ocho. Resolución Solicitud a la Asamblea Legislativa sobre aumento en el número de Jueces del Tribunal Supremo, 27 de enero de 1961.

 La Asamblea Legislativa acogió la petición del Tribunal al aprobar la Ley Núm. 7 de 6 de mayo de 1961. Esta ley fue aprobada mediante votación unánime en la Cámara de Representantes y con solamente tres votos en contra en el Senado. Es curioso que durante el debate de esta medida, el Senador Carrasquillo preguntó por qué, si el Tribunal Supremo de Estados Unidos, un país considerablemente más grande que el nuestro, tenía nueve Jueces, era necesario tener el mismo número de Jueces en nuestro propio Tribunal. Diario de Sesiones de la Asamblea Legislativa (Senado), Vol. 14, T. 1, 31 de enero de 1961, pág. 110. También son dignas de men-cionarse las expresiones del senador delgado Reyes en su voto explicativo sobre la importancia de que el Tribunal desempeñe “sus delicadas funciones con la reflexión y deliberación que ellas exigen”. Diario de Sesiones, supra, 7 de febrero de 1961, pág. 140. Temo que ese consejo no ha sido acogido por la Mayoría de este Tribunal.

 Véase A. García Padilla y J.J. Álvarez González, El Tribunal Supremo de Puerto Rico: la Corte Pons, 59 (Núm. 2) Rev. Jur. U.P.R. 185, 227 (1990). A pesar de que la Resolución de la que disentimos cita en cuatro ocasiones este artículo de los profesores Álvarez González y García Padilla, la Mayoría que la redacta hace caso omiso a las advertencias de sus autores en cuanto a que el sistema de salas fue acertadamente descartado hace décadas y “debe permanecer en el rincón del olvido”. íd.

 Véase Comité para el Estudio y la Evaluación del Sistema Judicial, Informe sobre el Tribunal Supremo, abril de 1965, págs. 4-5.

 In re Composición del Tribunal Supremo, Resolución de 19 de febrero de 1975. Esta petición unánime que hiciéramos fue aprobada con un solo voto contra el Senado de Puerto Rico y por una mayoría abrumadora de la Cámara de Representantes.

 In re Composición del Tribunal (Art. V, Sec. 3 de la Constitución), Resolución de 29 de marzo de 1984.

 Ley Núm. 49 de 2 de agosto de 1994.

 Véase J.J. Álvarez González, La nueva ley de la judicatura y la competencia obligatoria del Tribunal Supremo: algunas jorobas de un solo camello, 65 (Núm. 1) Rev. Jur. U.P.R. 1, 27 (1996).

 Sobre el llamado “desbalance ideológico” como razón para aumentar la com-posición del Tribunal, véase Berrios Martínez v. Gobernador II, 137 D.P.R. 195, 274 (1994), opinión disidente del Juez Asociado Negrón García.

 “No es un secreto que el tema de la composición del Tribunal Supremo fue uno de mucho interés para la administración Rosselló. La plataforma electoral del partido de gobierno propuso una enmienda constitucional para fijar el número de los jueces del Tribunal en nueve y para eliminar su facultad constitucional exclusiva para promover cambios en el número de sus componentes. En distintos momentos se adoptaron diversos cursos de acción con un objetivo común: permitir al Gobernador hacer nombramientos inmediatamente al Tribunal Supremo. En orden cronológico, cuatro fueron estos cursos de acción. Primero, el Gobernador intentó que el propio Tribunal Supremo le entregara dos nombramientos, al anunciar que accedería a una solicitud del Tribunal para aumentar a nueve sus jueces. Segundo, la Asamblea legislativa aprobó y el Gobernador firmó una enmienda a la Ley de Retiro de la Judicatura que redujo los requisitos establecidos para que los jueces del Tribunal Supremo se retiren con pensión completa. De esta forma, la administración Rosselló invitó sotto voce a por lo menos dos jueces del Tribunal Supremo a que abandonaran el estrado sin consecuencias económicas. Tercero, cuando nada de lo anterior rindió los frutos deseados, se aprobó una nueva Ley de la Judicatura que, por diseño espe-cífico y consciente, como veremos, abultó dramáticamente el calendario del Tribunal Supremo. Finalmente, la nueva administración decidió proponer una enmienda a la Constitución.” (Escolios omitidos.) Álvarez González, supra, págs. 27-28.

 Las palabras del profesor Álvarez González respecto a esto son tristemente proféticas: “[e]n última instancia, el estado de nuestro sistema judicial no es aun peor hoy, gracias a la intervención valiente de 712,026 puertorriqueños [y puertorriqueñas] que prohibieron que se le asestara el puntillazo a nuestra judicatura. Nada garantiza que esa ciudadanía sacará la cara por nosotros nuevamente”. (Escolio omitido.) Álvarez González, supra, pág. 81.

 Esto contrasta con la Exposición de Motivos de la Ley Núm. 49 de 2 de agosto de 1994, cuando la Asamblea Legislativa se expresó en cuanto al rol del Pueblo en la decisión de aumentar la composición del Tribunal. “El fortalecimiento del sistema democrático requiere la participación plena del pueblo en sus asuntos de gobierno ... para que sea el pueblo, con su voto, el que determine la composición del Tribunal Supremo, de manera que se mejore y agilice la atención de asuntos ante ese foro.” 1994 (Parte 1) Leyes de Puerto Rico 207, 207-208.

 Chamberlain v. Delgado, 82 D.P.R. 6, 18-19 (1960).

 Pueblo v. Rosario, 80 D.P.R. 318, 328 (1958).

 Son aleccionadoras las palabras del profesor Luis Rafael Rivera Rivera cuando nos dice:
“Se insiste en que este movimiento requiere sólo la mayoría simple de los miem-bros del Tribunal. Quienes así piensan pierden de perspectiva que el principio ma-yoritario, en lugar de la regla de la unanimidad, tiene sentido cuando las decisiones deben tomarse rápidamente, no cuando son el producto de la reflexión pausada. En realidad, más que unanimidad, exigen consenso; algo que no se limita a una mera votación, sino que presupone un acuerdo que nace de un ejercicio sincero de buena fe y responsabilidad. Buena fe acerca de las intenciones que se buscan. Responsabili-dad porque las partes se obligan a lograr un fin compartido.” Rivera Rivera, supra, esc. 3.

 Hernández Agosto v. López Nieves, 114 D.P.R. 601, 621 (1983), opinión del Tribunal del Juez Presidente Trías Monge.

 Ejemplo de esto es el nombramiento de jefes de agencia e integrantes de la Judicatura. Art. IV, Sec. 5 y Art. V, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1. De igual forma, la Constitución aborrece el Parlamento sin oposición, garantizándole a las minorías al menos una tercera parte de los escaños legislativos. Art. Ill, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Lo que es más, tras garantizarle a la minoría una tercera parte de las cámaras legislativas, la Constitución exige una votación que necesariamente necesita del apoyo de esa minoría para superar el veto del Ejecutivo, para expulsar a un representante o senador, para llevar a cabo un residenciamiento o para proponer enmiendas a la Constitución. Art. Ill, Secs. 19, 9 y 21, y Art. VII, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, respectivamente.

 A modo de ejemplo, la Ley Electoral de Puerto Rico requiere unanimidad entre los partidos políticos para un sinnúmero de decisiones. Ley Electoral de Puerto Rico, 16 L.P.R.A. see. 3001 et seq. Ese requisito de unanimidad es producto del reco-nocimiento de que, para que un proceso electoral tenga legitimidad, su conducción debe ser el resultado del acuerdo de todas las partes en la contienda. Una mera mayoría quebrantaría irremediablemente la confianza del Pueblo en el proceso electoral. Las demás instituciones no estamos exentas de ese riesgo y, por lo tanto, de esa responsabilidad.

 Barry Friedman, The History of the Countermajoritarian Difficulty, Part II: Reconstruction’s Political Court, 91 Geo. L.J. 1, 3 (2002).

 Véase la resolución In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54 (2010).

 Véanse: F.E. Breen, Solutions for Appellate Court Congestion, 47 J. Am. Jud. Soc. 228, 229 (1964); R. Kagan y otros, The Evolution of State Supreme Courts, 76 (Núm. 5) Michigan L. Rev. 961 (1978). Las estadísticas citadas por la Mayoría, en las páginas 60-64 de su Resolución, tal y como se utilizan, inducen al error. En primer lugar, la supuesta eficiencia cuantitativa de los tribunales de nueve jueces no surge de su número total, sino de su operación en salas. Como hemos visto, la operación en salas, si bien puede ser eficiente cuantitativamente, empobrece cualitativamente el trabajo del Tribunal. Regresar al sistema de salas haría que nuestra labor se ase-meje más al trabajo del Tribunal de Apelaciones y menos a lo que se supone que seamos, es decir, el tribunal de última instancia. En segundo lugar, la conclusión forzosa de las estadísticas citadas es que, si no se utiliza el sistema de salas, un tribunal de nueve integrantes no tiene por qué ser más eficiente que uno de siete. Las estadísticas apuntan más a una eficiencia producto del trabajo en salas y no de un aumento de jueces. En cuanto a esto, nada impide que un tribunal de siete jueces opere en salas, si eso es lo que se quiere. Pero, como surge del Informe del Comité para el Estudio y la Evaluación del Sistema Judicial de 1965, las ventajas del sis-tema de salas no justifican su uso y se deben utilizar otras alternativas para atender la congestión del calendario, cuando la haya. Comité para el Estudio y la Evaluación del Sistema Judicial, supra, págs. 4-5.

 Recordamos las palabras del Juez Asociado Stevens en su disidencia en Bush v. Gore, 531 U.S. 98, 129 (2000): “[T]he identity of the loser is perfectly clear. It is the Nation’s confidence in the judge as an impartial guardian of the rule of law.”

 Véase esc, 9.

 García Padilla y Álvarez González, supra, pág. 186 esc. 5.

 Se invocó la Regla 50 del Reglamento del Tribunal Supremo, 4 L.RR.A. Ap. XXI-A, para acortar los términos.